## DAVIS *v.* THE STATE.

No. 8828. AUGUST 11, 1932.

*O. C. Darsey,* for plaintiff in error.

*George M. Napier, attorney-general, J. T. Grice, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

HILL, J. Will Davis was indicted for the murder of a three-year old girl, his granddaughter, by beating her with a certain wooden stick. The jury trying him returned a verdict of guilty, without recommendation, and he was sentenced to die by electrocution. He made a motion for new trial, which was overruled, and he excepted.

The body of the child was found buried in a "bacon box" barely large enough to place the body in crosswise; the grave was just large enough to contain the box, which was buried about 3-1/2 feet under the ground. The physician, Dr. Baggs, who examined the child after the body had been exhumed, testified that one leg was broken at the hip, and the body showed signs of having been beaten, and that, in his opinion, the blows had produced death. The sheriff

testified to substantially the same facts. The defendant stated to the sheriff, when asked where the child was, that she had been taken up north by a relative; and later, when confronted with the fact of the discovery of the child's body, the defendant stated that the child had died a natural death, that she had been sickly from birth, and was covered with sores; that when she died he was afraid he would be prosecuted for not having secured the services of a physician; and that he had buried the body secretly. The grave was level, in the edge of a swamp, the surplus earth had been carried away from the grave and grass planted over the spot. Apparently every effort was made to hide the spot where the child was buried.

A witness for the State, Henry Cannety, testified, among other things: "I do not know exactly how close I work to the place where he [defendant] lived. I did not measure it, something under a half a mile. . . I was plowing in a field. I worked out there this spring, tending separate fields. I saw something of Will Davis out there. I don't go much around his place while I was out there working. He never gave me any encouragement to go around there. This place where I was working had no shelter or building on it, except I had an old house out there. When it rained I went under the shelter. As to whether I ever had occasion to go to his house when it rained, you got the cart before the horse. Let me see now, when Mr. Davis was living on Mr. Russ Rimes', I had a place right side of Mr. Russ Rimes', when Mr. Davis was living right at the place; then when it rained he never did ask no one in his house, and I would go to the ........ woman's house to get out of the rain. That woman's house was further than where Will Davis lived. I remember hearing about a baby dying at his house, or digging one up. I was working down there that part of the year. I do not know the day they say they buried the child. I don't know about the burial. I heard about it. I don't know what day I heard that they buried the child. I don't know what day the child was buried; I never took no note of it. I heard about the child being buried from his house. I heard some hollering over to his house on the 16th of May, on a Saturday. I was out to the field plowing. I heard about the child being buried sometime later, about five or six days later, I suppose. Now, how I know it was on Saturday, it was the 16th day of May, and I was in the field plowing. It was about 8 or 9 o'clock in the morning. What I heard

was, I heard the children hollering over there at Will Davis's house. I know whether Will Davis was over there or not. I seen him there, and I seen one of the children running across there and I saw Will Davis at the house. I saw the child running across to woods going from the house. It sounded like the whole business over there was hollering for a while. I don't know anything about where the child went to. I did not stop plowing. There was a lot of whooping and hollering over there. That child that ran off was a good-size girl. What I call a good-size girl is, it was one of them girls out there [indicating witness room]. It was over half grown. The rest of this hollering was at his house. It looked like the whole business was hollering for a while. This child that was running off, or some one else over there, was hollering loud enough for me to hear it. She was hollering and saying, 'Don't kill Mama.' That is what the child said. The other kids there were hollering. I don't know anything about where the child went to. As I said, I did not stop plowing. I said the rest of the hollering was at the house. What Will Davis seemed to be doing was he seemed to be hitting some one with a switch or something. From the motions that he was making it looked like he was tearing them up. The kind of a motion that he was making was like this [indicating striking motions]. The hollering was going on then; that was on Saturday. I heard later about the digging up of the baby over there. They told me that the baby was dug up sometime later. It seems like it was four or five days before they dug the baby up. That was on Saturday morning about 9 o'clock."

On cross-examination this witness testified: "There is a little pond between my farm and Davis's house where he lives. That little pond is not very big. It is not very thick. My field is not quite half a mile from this pond. I don't know how far it is from the pond to Davis's house; it is not very far. It is not a mile; it is not over two or three hundred yards; that is, it is two or three hundred yards from Davis's house to the pond and half a mile from the pond to my house. It was about 9 o'clock in the morning that I heard this hollering. What I was doing was I was plowing. I was plowing my corn crop. That is what I was plowing in. I heard the child hollering, 'Don't kill Mama.' I see this man doing this way [indicating]. He was in the clear when I saw him. I and this man [defendant] are pretty good friends. We haven't had any

trouble. I did not go to see this woman when the rain came up. The reason I went to her house was he would not invite me in, and that is how I come to go to Marguerite's. Marguerite lives over there from where I was plowing, further than Davis did, and I was friendly to Davis; but he just didn't ask me in, and consequently I had to go to Marguerite's to get out of the rain."

From the entire evidence in the case the jury were authorized to find the defendant guilty.

■ Ground 1 of the amendment to the motion for new trial is but an elaboration of the general grounds.

■ Ground 2 presents newly discovered evidence of J. B. Smith and E. P. Baggs, which is contained in their affidavits in which they state as a matter of fact that it is now, and was at the time of the alleged homicide, an impossibility for Henry Cannety, or any other person to have seen the house of the defendant, Will Davis, from the field of Cannety, or to have seen a person or any other object that could be taken as that of a person from the cornfield where Cannety stated he was plowing and saw what he testified that he did see. This evidence is merely impeaching in its character and does not require a new trial.

■ Ground 3 is based upon the newly discovered evidence of A. G. Pinkston as contained in his affidavit, in which he specifically states that Dr. B. W. Baggs, who examined the body of the deceased, made no thorough examination of the child's body and did not put his hands upon the body, and only used a stick to turn the body about and make his examination. It is contended that this affidavit impeached the testimony of sheriff T. F. Chapman, who swore that Dr. Baggs with his hands and fingers made a thorough examination of the body, and testified, from his examination so made, that the child had been beaten to death and that her right leg had been broken about one inch from the hip-joint. This evidence also is merely impeaching in its character, and does not require a new trial. None of the alleged newly discovered evidence is such as would probably produce a different result on another hearing of the case; and therefore the trial judge, who heard the entire case, including the newly discovered evidence, being satisfied with the verdict, this court does not feel authorized to disturb his judgment overruling the motion for new trial.

*Judgment affirmed. All the Justices concur..*